## AFFIDAVIT OF BRIAN A. COHOON IN SUPPORT OF ARREST WARRANT AND SEARCH WARRANTS

I, Brian A. Cohoon, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a police officer for the Braintree Police Department and I currently serve in the rank of Detective.  I am assigned full-time to the Federal Bureau of Investigation ("FBI") Boston Division as a Task Force Agent with the Organized Crime Drug Enforcement Task Force (OCDETF Strike Force), which consists of federal law enforcement agents from the FBI and other federal agencies, including the U.S Drug Enforcement Administration ("DEA"), the Immigration and Customs Enforcement ("ICE"), the U.S. Marshals Service ("USMS), and other state and local law enforcement agencies.  I have been a sworn police officer with the Town of Braintree since 1985 and have been assigned to both the South Shore Drug Task Force and Metropolitan Law Enforcement Council.  As a FBI Task Force Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. §2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. §2516.

2.     As part of my Police Academy training conducted by the Boston Police Academy and sponsored by the Massachusetts Criminal Justice Training Council, I was instructed in drug recognition and investigative techniques.  I have also acquired in excess of five hundred hours of specialized training relating to narcotics' enforcement at

both the federal and state level. I have completed the DEA 80-hour Narcotics School and am certified by the Federal Law Enforcement Training Center in Narcotics Investigations and Surveillance Techniques. I hold a Bachelor's degree in Criminal Justice.

3.      During my career in law enforcement, I have participated in a number of arrests and investigations for violations of Massachusetts state drug laws and federal criminal law. I have been the affiant on over 30 search warrants and participated in the execution of over 100 search warrants. As the result of my training and experience, I am familiar with the methods, routines and practices of individuals involved in the sale and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver and dispense heroin, cocaine, marijuana and other controlled substances. I have provided testimony in numerous District and Superior Courts in the Commonwealth of Massachusetts as well as in the United States Federal Court.

4.      I have personally participated in the investigation of this case. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other agents of the FBI, and other federal, state and local law enforcement agencies; oral and written reports from agencies referenced herein; and conversations and meetings with victims and witnesses; and my own personal participation in the investigation, including witness interviews.

## PURPOSE OF AFFIDAVIT

5.      I am submitting this affidavit in support of an application for a criminal complaint charging Fernando LNU, a/k/a Cesar GONZALEZ ("Gonzalez"), Weslley

2

HERNANDEZ, Osvaldo ORTIZ-VENTARA, and Kevin SANDERSON (collectively, "Target Subjects") with one count of conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §846.

6.      I am further submitting this affidavit to set forth probable cause in support of my applications for search warrants authorizing the search for and seizure of evidence of the crime of conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §846, from

a. **1455 River Street, Apartment 1-Right,  Hyde Park, Massachusetts**, which is an apartment in a multi-unit apartment building.  A full description and photograph(s) of the residence to be searched pursuant to a search warrant is attached hereto as Attachment A1 to the Application and Affidavit for Search Warrant, which is incorporated herein by reference. The items to be seized from this location are described in Attachment B, attached hereto and incorporated herein.

b. **401 Engamore Lane, Unit 202, Norwood, Massachusetts**, which is an apartment in a multi-unit apartment building.  A full description and photograph(s) of the residence to be searched pursuant to a search warrant is attached hereto as Attachment A2 to the Application and Affidavit for Search Warrant, which is incorporated herein by reference.  The items to be seized from this location are described in Attachment B, attached hereto and incorporated herein.

3

7.     For the reasons set forth herein, I submit that there is probable cause to believe that evidence of drug-trafficking offenses in violation of Title 21, United States Code, Section 846 (conspiracy to distribute controlled substances) will be contained within the locations identified in Attachments A1 and A2. I believe that evidence regarding the involvement of a drug trafficking organization will be found at these locations. I also believe that evidence of the use, control and dominion of the locations by various members of the drug trafficking conspiracy will be found at these locations.

8.     As a result of my personal participation in this investigation, through my conversations with other law enforcement officers, upon information that I have received from a variety of other sources, including public records, and my analysis of reports prepared by other officers, I am familiar with all aspects of this investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

9.     On January 26, 2014 at 5:57 a.m., Angela Bissell called police and medics to report the apparent heroin overdose of her boyfriend, Steven Radeos. Radeos was a former Braintree Police Department ("BPD") confidential informant. Radeos was transported to Quincy Medical Center where he died the next day. A small amount of heroin and a large-gauge needle were found on the bathroom floor next to Radeos' body and seized by BPD. The heroin was analyzed by the DEA laboratory and determined to

4

contain Fentanyl and the animal painkiller Dipryone.   An autopsy has yet to be concluded.

10.     Bissell also turned over Radeos' cell phone to the BPD detectives investigating his death.   Law enforcement officers reviewed the text messages and content stored in the phone, and they also verified that the phone Bissell turned over to BPD was indeed used by Radeos prior to his death.

11.     A series of text messages retrieved from Radeos' phone revealed that on January 25, 2014, Radeos texted SANDERSON and asked if SANDERSON could get heroin for Radeos.   SANDERSON replied, "I can call my guy who has fire.   Probably best shit you will ever do but he only does $100s.   There big though."   After Radeos confirmed he wanted to purchase the heroin, SANDERSON texted Radeos at approximately 2:07 p.m., "I'm waiting for a call back.   But I can't call him till I know your ready with money in hand.   He might say 20 mins he might say a hour.   He changes shift for his drivers around 2:30-3pm."   At approximately 2:10 p.m., Radeos texted SANDERSON asking, "I have the loot would he go to my work its at a gas station."   SANDERSON replied, "No he will only meet me."

12.     In a later series of text messages, SANDERSON directed Radeos to bring his money to SANDERSON's work location.   SANDERSON warned Radeos, "And bro no joke this shit is fire.   Be careful and don't think your superman with this shit.   This shit will knock you on your ass."   Radeos asked SANDERSON if he had a "pin" (a needle).   SANDERSON replied, "No wait maybe.   It's a used one.   But I'm clean.   Not even hep! Lol."   At approximately 3:31 p.m., SANDERSON texted Radeos, "Let me

5

know if that stuff is any good. He just asked how it was because it's different shit. Normally this shit is always fire. Like literally the best shit I've ever done in my life. But it's definitely different then what I got earlier."

13.     After reviewing Radeos' cell phone, BPD detectives approached SANDERSON while he was at work (Quirk Chevrolet car delearship). BPD detectives read SANDERSON his Miranda warnings, which SANDERSON waived. SANDERSON agreed to cooperate in the investigation. On February 7, 2014, BPD detective and FBI Strike Force Officer Brian Cohoon interviewed SANDERSON. SANDERSON again waived his Miranda rights and admitted that on January 25, 2014, he purchased heroin for Radeos from a supplier he knew only by the name "Fernando," later found to be using the alias "Cesar GONZALEZ."

14.     SANDERSON said he had been purchasing heroin from GONZALEZ for at least one month prior to Radeos' death. SANDERSON got GONZALEZ's phone number from other heroin users who were long-time customers of GONZALEZ's. SANDERSON called or texted GONZALEZ to place heroin orders. GONZALEZ always sent couriers to deliver the heroin to SANDERSON. SANDERSON gave agents GONZALEZ's cell phone number. Beginning on March 15, 2014, agents began tracking GONZALEZ through federal court-authorized GPS cell-site warrants.

15.     SANDERSON told agents that GONZALEZ used couriers to deliver heroin to SANDERSON approximately every two days. SANDERSON identified Weslley HERNANDEZ and Osvaldo ORTIZ-VENTARA by photographs as the two

couriers who delivered heroin for GOZNALEZ. SANDERSON also identified the vehicles HERNANDEZ and ORTIZ-VENTARA drove when making their delivers.

16.     SANDERSON said that the heroin GONZALEZ sold was more potent than any heroin SANDERSON or his drug-using friends had bought from other sources. SANDERSON also reported that GONZALEZ's heroin was "color coded," apparently to indicate different purities, and that GONZALEZ had warned SANDERSON of the heroin's potency.

17.     Since February 8, 2014, SANDERSON has made over 20 controlled purchases of heroin from GONZALEZ.   SANDERSON arranged each purchase by calling or texting GONZALEZ.   Each call was either monitored by law enforcement officers or recorded.   After SANDERSON placed each order, GONZALEZ gave SANDERSON a time and location to meet to purchase the heroin.   Officers gave SANDERSON money to purchase the heroin, and each purchase was surveilled by law enforcement. Each time, GONZALEZ sent either HERNANDEZ or ORTIZ-VENTARA to deliver the heroin to SANDERSON at the car dealership where SANDERSON works. Surveillance units confirmed HERNANDEZ and ORTIZ-VENTARA's identities while monitoring the deliveries. Prior to each delivery, GONZALEZ would either call or text SANDERSON when his courier arrived, directing SANDERSON to go outside to meet the courier.

18.     On April 14, 2014, at approximately 3:54 p.m., SANDERSON placed a call to GONZALEZ to order heroin.   This call was recorded.   During the call, GONZALEZ told SANDERSON, "OK. You gotta tell em you like the stuff. Let me

7

know. I can get that one buddy. You can handle that. You can handle that one."
SANDERSON told GONAZLEZ he would let him know about the quality. GONZALEZ
replied, "You tried it already." GONZALEZ was referring to heroin he had previously
sold to SANDERSON.

19. At approximately 5:07 p.m., GONZALEZ called SANDERSON and told
him, "He is there." SANDERSON went into the parking lot and got into ORTIZ-
VENTARA's car. ORTIZ-VENTARA gave SANDERSON a yellow bag in return for
$100. Surveillance officers observed SANDERSON getting into ORTIZ-
VENANTARA's car and identified ORTIZ-VENTARA as the driver. After the
purchase, SANDERSON gave officers the yellow bag. Field tests confirmed the
presence of opiates.

20. On April 17, 2014, agents used the cell-site information from
GONZALEZ's phone to stop and identify him. At approximately 11:00 a.m., MSP
Trooper Keith Pantazelos stopped a Jeep Wrangler, Massachusetts Registration 914VR8.
GONZALEZ, who was driving the Jeep, identified himself by producing a Rhode Island
temporary driver's license, bearing the name Alex Arroyo. During this stop, TFO
Cohoon called GONZALEZ's phone and Trooper Pantazelos heard a phone vibrating
inside the Jeep, indicating an incoming call.

21. After the stop, Task Force Officer Cohoon confirmed through a search of
motor vehicle databases that the identity GONZALEZ provided during the stop was false.
He also learned that there was an outstanding drug arrest warrant from New York State

8

for the name and date of birth on the Rhode Island identification that GONZALEZ had produced.

22.     Surveillance officers and TFO Cohoon continued to follow GONZALEZ after the stop. During this time, TFO Cohoon called GONZALEZ's phone and watched him answer the phone.  GONZALEZ called TFO Cohoon's number and TFO Cohoon explained that he had dialed the wrong number.  TFO Cohoon recognized GONZALEZ's voice from the recorded and monitored calls between GONZALEZ and SANDERSON.

23.     Later that afternoon at approximately 1:44 p.m., TFO Cohoon directed Norwood Police Department Sergeant Rinn to again stop the Jeep Wrangler.  At the time of the second stop, GONZALEZ was still driving the Jeep.  The passenger, Nelson Gonzalez, was identified by his Massachusetts driver's license.  Nelson Gonzalez is believed to be Cesar GONZALEZ's brother.

24.     During this stop, GONZALEZ produced the same fake identification. Sergeant Rinn informed GONZALEZ of the New York State arrest warrant and questioned the validity of his driver's license.  GONZALEZ disputed that the warrant was for him and agreed to go to the police station to have his fingerprints taken to prove his true identity.

25.     GONZALEZ was printed, and those prints matched the prints for Cesar GONZALEZ, date of birth November 22, 1969, with a listed address in the Bronx, New York. It was further revealed that GONZALEZ had two outstanding warrants under two different names:  1) a 2012 Cambridge District Court default warrant for distribution of Class A and B controlled substances in the name Cesar GONZALEZ; and 2) a 2007

9

Dorchester District Court arrest warrant for suspended registration in the name Miguel Torres.  GONZALEZ was arrested on the warrants.  When asked about his identity, GONZALEZ admitted that he was from Bani, Dominican Republic, but told officers he did not want them to know his true identity.  GONZALEZ was held in Cambridge on a $50,000 bond.  TFO Cohoon took possession of the two phones GONZALEZ had in his possession.

26.    On April 21, 2014, SANDERSON told TFO Cohoon that he had called GONZALEZ's cell phone and had spoken with a person, who identified himself as "Fernando's brother."    This person told SANDERSON that "Fernando" was "on vacation" but that he could get SANDERSON "what he needs."

27.    Based on this information, agents contacted AT&T Wireless and learned that GONZALEZ's phone number had been transferred to a new phone with a new IMSI on April 18, 2014 – the day after GONZALEZ's arrest.

28.    On April 25, 2014, TFO Cohoon met with a second cooperating witness ("CW") for the purpose of placing a consensually recorded call to GOZNALEZ to order heroin.  On April 25, 2014 at approximately 9:51 a.m., CW placed a recorded call to GONZALEZ's phone and spoke with an unidentified male ("UM").  CW said, "Hello, GONZALEZ. It's Tommy." UM replied, "Who?" The CW said, "Tommy on Arbutus." UM replied, "Tommy?"  The CW again said, "Tommy on Arbutus. Yup.  I'm at my house." When the UM questioned the "new number" that CW was using to call, CW told UM he had just gotten out of "rehab."  CW asked UM to come to see him at CW's house.

UM told CW that "they" were "not open until 11 today." UM told CW to text him the address and to call later.

29.     At approximately 10:06 a.m., CW texted UM his address, which is on Arbutus Street.   At approximately 10:46 a.m., CW placed a second recorded call to GONZALEZ's number.  The same UM answered the phone and asked CW if he was the "friend of the people working at the dealer."  As detailed above, SANDERSON works at a car dealership.  CW affirmed, and UM said, "Okay."  The UM indicated he could not get to CW's house for an hour because he had a "few people in front of him."

30.     After a couple more recorded calls and/or text messages, a male called CW from GONZALEZ's phone and told him that "his guy" was at CW's house.  The caller told CW that he did not want his "guy going inside today" and told CW to go out to the car.  At the time of this call, TFO Cohoon, observed Target Subject HERNANDEZ arrive in a silver Toyota (New York Registration FZF8097) and stop in front of 44 Arbutus Street, CW's address. CW got into the Toyota and the vehicle drove off.  A few minutes later, surveillance units observed CW getting out of the Toyota on Calendar Street and walking back to Arbutus Street.

31.     A few minutes later TFO Cohoon met with the CW, who turned over a yellow plastic bag of suspected heroin.  CW was searched and determined to have no other contraband.   CW reported that once he got into the Toyota, HERNANDEZ removed one bag from his mouth and handed it to CW. HERNANDEZ motioned for CW to put it in his mouth before CW got out of the car.  The substance field tested positive for the presence of opiates.

32.     On April 25, 2014, GONZALEZ was released after Alexander Suazo, who resides at 14 Dalrymple Street, Apartment 3, Jamaica Plain, Massachusetts, posted his $50,000 cash bail.

33.     On April 30, 2014, GONZALEZ sent HERNANDEZ to deliver a sample of heroin to SANDERSON. The heroin was in an orange-colored bag. SANDERSON called TFO Cohoon and told him about the unexpected visit. SANDERSON gave the orange-colored bag to Cohoon and placed a recorded call to GONZALEZ.

34.     During that call, SANDERSON asked GONZALEZ if he "cut that stuff with anything." GONZALEZ said, "No." SANDERSON said, "A while back, one of my buddies got some of the stuff when I met you one time and he ended up OD-ing. He couldn't handle it, and just wondering, making sure there is no Fentanyl or anything in it." GONZALEZ denied putting any "shit in it." GONZALEZ said, "Maybe it was too much quality for him, you know." SANDERSON asked if any of GONZALEZ's other customers "got really fucked up on it." GONZALEZ replied, "Oh, some people don't [UI] because some people said it's not, some people... It's too strong for some people but not for you. It's not [UI] that stronger you know." GONZALEZ said he "always tr[ies] to have the best shit around." GONZALEZ asked if SANDERSON had tried the "stuff." SANDERSON said he had had not tried it yet. GONZALEZ asked if SANDERSON was going to go to "rehab" for a while. SANDERSON said he was probably going to go for a week.

35.     SANDERSON asked if GONZALEZ could bring him more heroin. GONZALEZ asked if it was for "Tommy." SANDERSON said it was for another friend.

12

SANDERSON asked if it was going to be the "new or the old stuff." GONZALEZ said, "The old stuff. The old stuff. Try this one buddy. I need to know very first, you know?" GONZALEZ was referring to the sample he had delivered to SANDERSON earlier that day.

36.     About an hour later, GONZALEZ called SANDERSON back and again asked if he had tried the sample. SANDERSON said that he had. GONZALEZ asked, "It's good?" SANDERSON replied that it was. GONZALEZ asked, "Like a nine?" SANDERSON replied, "Yeah, eight or nine." GONZALEZ thanked SANDERSON. A couple of minutes later, GONZALEZ called SANDERSON and said, "He's there buddy."

37.     Surveillance units outside saw ORTIZ-VENTARA arrive at SANDERSON's work place. SANDERSON got into the car, and ORTIZ-VENTARA handed him a yellow-colored bag. SANDERSON gave that bag to officers. The contents have been sent to the DEA laboratory for testing.

38.     On May 7, 2014, GONZALEZ called SANDERSON and advised that he had a new phone number (617-470-0222). On May 9, 2014, SANDERSON called GONZALEZ's new number to order heroin. This call was consensually recorded, and TFO Cohoon, who was monitoring the call, recognized GONZALEZ's voice from prior phone calls.

39.     About an hour later, HERNANDEZ arrived at SANDERSON's work place to deliver the heroin SANDERSON had ordered from GONZALEZ. Surveillance units observed the meeting between SANDERSON and HERNANDEZ. HERNANDEZ delivered the heroin to SANDERSON and drove away.

40.     Officers from the Braintree Police Department stopped HERNANDEZ as he drove away and arrested him for driving with a suspended license. He was transported to the police station and interviewed, after waiving his Miranda rights. During that interview, HERNANDEZ identified a photograph of Cesar GONZALEZ, whom he knew by the name "Fernando." HERNANDEZ admitted that he had been selling heroin for Fernando for approximately two years. HERNANDEZ told officers that each day he picked up about 10 grams of heroin from an apartment located at 1455 River Street in Hyde Park and then delivered the heroin to Fernando's customers. HERNANDEZ further told officers that a person named "Mike" who drove a Passat wagon also delivered heroin for Fernando.

41.     On May 23, 2014, HERNANDEZ called TFO Cohoon and reported that GONZALEZ had confronted him about his arrest. HERNANDEZ told Cohoon that GONZALEZ had taken his cell phone after HERNANDEZ told him (GONZALEZ) that law enforcement officers had asked questions about GONZALEZ. HERNANDEZ further admitted that he told GONZALEZ about the police investigation into GONZALEZ's drug distribution activities.

42.     Based on the facts described above, I believe there is probable cause that between from on or about January 1, 2014 through on or about June 1, 2014, Fernando LNU, a/k/a Cesar GONZALEZ, Weslley HERNANDEZ, Osvaldo ORTIZ-VENTARA, and Kevin SANDERSON conspired to possess with intent to distribute heroin, in violation of 21 U.S.C. §846.

14

## FURTHER EVIDENCE SUPPORTING PROBABLE CAUSE TO SEARCH TARGET LOCATIONS 1 AND 2.

43.     Based on my training and experience, my knowledge of the investigation, intercepted telephone calls, physical surveillance, various data base checks, I believe the below-listed locations are being utilized by various members of this organization to facilitate the distribution of large quantities of suspected marijuana. I further believe that these locations are being utilized to store large amounts of currency and documentation detailing the distribution of illegal drugs.

### Target Location 1

44.     Target location 1 is a first floor apartment located inside a multi-unit apartment building located at 1455 River Street, Hyde Park, Massachusetts. The utilities for Target Location 1 are in the name of Target Subject Osvaldo ORTIZ-VENTARA. The contact phone number for Target Location 1 is a phone subscribed to in the name of Nelson Gonzalez, who is Cesar GONZALEZ's brother. Based on physical surveillance, I believe Nelson Gonzalez resides at Target Location 1.

45.     Agents have seen GONALEZ, HERNANDEZ and Nelson GONZALEZ coming and going from 1455 River Street during this investigation. HERNANDEZ was last seen at this address on April 25, 2014, approximately one hour before HERNANDEZ delivered heroin to the CW that the CW had ordered from GONZALEZ. GONZALEZ was last seen coming out of Target Location 1 on May 1, 2014.

46.     In addition, pursuant to a federal warrant, between March 15, 2014 and April 15, 2014, agents were tracking ORTIZ-VENTARA's and HERNANDEZ's

vehicles. During that timeframe, GPS data showed that ORITZ-VENTARA's and HERNADEZ's vehicles were in the vicinity of Target Location 1 on at least 25 occasions. The GPS tracking devices on HERNANDEZ's and ORTIZ-VENTARA's cars indicated that HERNANDEZ and ORTIZ-VENTARA went to 1455 River Street approximately every one to two days between March 15, 2014 and April 15, 2014. The GPS information further indicated that HERNANDEZ's and ORTIZ-VENTARA's cars were in the vicinity mostly in the morning hours and each time, the cars stayed in the vicinity for a short period of time prior to leaving. The frequency of the morning trips and the duration of the visits are both consistent with this location being used as a drug stash house. I believe HERNANDEZ and ORTIZ-VENTARA would travel to Target Location 1 to pick up heroin that they later distributed for GONZALEZ.

47. Moreover, as detailed above, on May 9, 2014, HERNANDEZ, after waiving his *Miranda* rights, told agents that GONZALEZ kept heroin inside Target Location 1, that HERNANDEZ would pick up heroin to be delivered from Target Location 1, and that Nelson Gonzalez, Cesar GONZALEZ's brother, lived in Target Location 1.

48. HERNANDEZ also told TFO Cohoon that during the timeframe that GONZALEZ was in custody (4/17/14 through 4/25/14), HERNANDEZ continued to pick up heroin from a person he knew by the name "Jose" from 1455 River Street. As indicated above, HERNADEZ identified a photograph of Nelson Gonzalez as the person who took over GONZALEZ's heroin distribution business during the time GONZALEZ was in custody.

16

49.     Recorded calls with CW also indicate that GONZALEZ's organization kept records of its customers.  As detailed above in paragraph 29, when CW called GONZALEZ's prior phone number to order heroin when GONZALEZ was in custody, the person who took his order (believed to be Nelson Gonzalez) asked CW if he was the "friend of the people working at the dealer."  This was a reference to SANDERSON, who was a long-standing customer of GONZALEZ's.

50.     In addition, during the timeframe that GONZALEZ was in custody, the GPS signals from GONZALEZ's phone number indicated that the phone was in the immediate vicinity of Target location 1.  Based on the above, I believe Nelson Gonzalez, the resident of Target Location 1, was using GONZALEZ's phone number and running GONZALEZ's heroin distribution business from Target Location 1 while GONZALEZ was in custody.

51.     It appears from physical surveillance that someone is still living in Target Location 1.  Although the shades on the windows are drawn, lights have been seen on and off inside Target Location 1 as recently as June 7, 2014.

52.     In my training and experience, it is common for drug dealers to store drug proceeds, identification documents, old cell phones, and records containing their customer's information inside their residences.  As described above, evidence indicates that Nelson Gonzalez was operating GONZALEZ's drug business from Target Location 1 while GONZALEZ was in custody.  Accordingly, I believe there is probable cause to believe that documents, records and evidence of drug distribution, drug proceeds,

identification documents of the Target Subjects and cell phones previously used by Target Subjects during this investigation will be found at Target Location 1.

## Target Location 2

53.     Target location 2 is a second floor apartment inside a multi-unit apartment building located at 401 Engamore Lane, Unit 202, Norwood, Massachusetts. The utilities and lease for Target Location 2 are in the name of Gregoria Pires. Pires is believed to be GONZALEZ's girlfriend. GONZALEZ is believed to be residing at this location with Pires.

54.     Agents have seen Gonzalez coming in and out of 401 Engamore Lane. Specifically, on May 1, 2014 at approximately 12:44 p.m., I followed GONZALEZ, who was driving a car registered to Pires, from Target Location 1 to 401 Engamore Lane. I saw GONZALEZ enter the building at 401 Engamore Lane and go inside Target Location 2.

55.     In addition, the GPS location information from GONZALEZ's old cell phone (347-479-7185) indicates that GONZALEZ was residing at Target Location 2 from on or about April 1-17, 2014. As detailed above, GONZALEZ was in custody from April 17-25, 2014. Subsequent to his release, GPS information from GONZALEZ's old cell phone number indicate that he went back to residing at Target Location 2 after his release.

56.     The most recent GPS location phone signals from GONAZLEZ's old cell phone placed him inside of Target Location 2 on May 8, 2014. That is the day before HERNANDEZ was arrested. Between May 9 and 30, 2014, agents were not obtaining

GPS information because GONZALEZ abandoned his phone on May 9, 2014.  On June

2, 2014 agents, pursuant to a federal court order, began receiving location information on

GONZALEZ's most recent phone (617-470-0222), which he is still using as of the date

of this Affidavit.  According to those records, he has not been at Target Location 2 since

June 2, 2014.  Since June, 5, 2014, GPS location information from GONZALEZ's new

phone show that he has been staying in Rhode Island.

57.     I believe that Target Location 2 is GONZALEZ's residence but that he has

been moving around in the last couple of weeks because of HERNANDEZ's arrest and

the fact that HERNANDEZ told GONZALEZ that he was the subject of an investigation.

In my training and experience, it is common for drug dealers to store drug proceeds,

identification documents, old cell phones, and records containing their customer's

information inside their residences.

58.     On the basis of all of the information detailed herein, as well as my

training and experience, because Target Location 2 is GONZALEZ's residence, I believe

that evidence of his drug trafficking activities, including his old cell phones, drug ledgers,

identification documents, and drug proceeds will be found at this location.

### Drug Traffickers' Use of Residences Generally

59.     I have participated in the execution of numerous search warrants at the

residences of drug-traffickers such as the targets of this investigation.  In a substantial

number of residential searches executed in connection with the drug investigations in

which I have been involved, the following kinds of drug-related evidence have typically

been recovered:

  a. books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

  b. personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

  c. cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

  d. documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

  e. cell phones.

60.    In addition, during the course of such residential searches, I and other

agents have also found items of personal property that tend to identify the person(s) in

residence, occupancy, control, or ownership of the subject premises.  Such identification

evidence is typical of the articles people commonly maintain in their residences, such as

canceled mail, deeds, leases, rental agreements, photographs, personal telephone books,

diaries, utility and telephone bills, statements, identification documents, and keys.

61.    Further, it is generally a common practice for drug traffickers to maintain

in their residences records relating to their drug trafficking activities.  Because drug

traffickers in many instances will "front" (that is, sell on consignment) controlled

substances to their clients, or alternatively, will be "fronted" controlled substances from

their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

62. Based upon my training and experience, I am also aware that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

63. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe that GONZALEZ, HERNANDEZ and ORTIZ-VENTARA, like many drug traffickers, have used residences in furtherance of their drug trafficking activities, and that evidence regarding those activities, including, but not limited to, drug ledgers, and other documents pertaining to the drug trade, as well as old cell phones and cash proceeds will be found in each of the Target Locations.

21

## CONCLUSION

64.     Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that GONZALEZ, HERNANDEZ, ORTIZ-VENTARA and SANDERSON have conspired to distribute heroin, in violation of 21 U.S.C. §846; and that there is probable cause to believe that ach of the premises identified in Attachments A1 and A2, presently contain the items set forth in Attachment B that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, specifically, a violation of 21 U.S.C. §846.  In particular, I believe that a search of each of the premises identified in Attachments A1 and A2 will reveal evidence regarding GONZALEZ, HERNANDEZ, ORTIZ-VENTARA and their coconspirators' use and distribution of narcotics, as well as proceeds from that distribution.  Accordingly, I respectfully request that a search warrant be issued for the seizure of the items set forth in Attachment B in each of the Target Locations described above.

Respectfully submitted,

Brian A. Cohoon
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me
on June 9, 2014:

HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

22

## ATTACHMENT A1

### (LOCATION TO BE SEARCHED)

**1455 River Street, Apartment 1-Right,  Hyde Park, Massachusetts**, which is an apartment in a multi-unit apartment building.  A full description and photograph of the residence to be searched pursuant to a search warrant is attached hereto as Attachment A1 to the Application and Affidavit for Search Warrant, which is incorporated herein by reference.  The items to be seized from this location are described in Attachment B, attached hereto and incorporated herein.



## ATTACHMENT B

## ITEMS TO BE SEIZED

The following is a list of the evidence, fruits and instrumentalities of violations of 21 U.S.C. §846 (conspiracy) to be seized:

1.      Documents evidencing narcotics possession, use, or trafficking, including but not limited to books, records, accounting records, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed, records of narcotics sales and records listing persons who owe money and who are owed money, receipts, purchase orders, notes, ledgers, and any other paper relating to the transportation, ordering, purchase, manufacturing and distribution of controlled substances, in particular, heroin;

2.      Photographs, including but not limited to photographs of co-conspirators, assets and/or controlled substances;

3.      documentary or other evidence manifesting dominion and control over the premises, including but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers;

4.      cellular/and or portable telephones;

5.      evidence pertaining to obtaining, secreting, transfer, concealment and/or expenditure of narctoics proceeds, such as:  currency, financial instruments, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks and safe deposit box keys;

6.      books or papers which reflect names, addresses and/or telephone numbers of associates in the trafficking organization.

## ATTACHMENT A2

### (LOCATION TO BE SEARCHED)

**401 Engamore Lane, Unit 202, Norwood, Massachusetts**, which is an apartment in a multi-unit apartment building.  A full description and photographs of the residence to be searched pursuant to a search warrant is attached hereto as Attachment A2 to the Application and Affidavit for Search Warrant, which is incorporated herein by reference.  The items to be seized from this location are described in Attachment B, attached hereto and incorporated herein.





# ATTACHMENT B

# ITEMS TO BE SEIZED

The following is a list of the evidence, fruits and instrumentalities of violations of 21 U.S.C. §846 (conspiracy) to be seized:

1.      Documents evidencing narcotics possession, use, or trafficking, including but not limited to books, records, accounting records, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed, records of narcotics sales and records listing persons who owe money and who are owed money, receipts, purchase orders, notes, ledgers, and any other paper relating to the transportation, ordering, purchase, manufacturing and distribution of controlled substances, in particular, heroin;

2.      Photographs, including but not limited to photographs of co-conspirators, assets and/or controlled substances;

3.      documentary or other evidence manifesting dominion and control over the premises, including but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers;

4.      cellular/and or portable telephones;

5.      evidence pertaining to obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks and safe deposit box keys;

6.      books or papers which reflect names, addresses and/or telephone numbers of associates in the trafficking organization.